No. 66,638

REINHARD SIMON, *Appellee/Cross-Appellant*, v. NATIONAL FARMERS ORGANIZATION, INC., *Appellant/Cross-Appellee*.

(829 P.2d 884)

Opinion filed April 10, 1992.

*Craig W. West*, of Foulston & Siefkin, of Wichita, argued the cause, and *James D. Oliver*, of the same firm, was with him on the briefs for appellant/ cross-appellee.

*John B. Gilliam*, of Klenda, Mitchell, Austerman & Zuercher, of Wichita, argued the cause and was on the brief for appellee/cross-appellant.

The opinion of the court was delivered by

MCFARLAND, J.: This is an action by the operator of a dairy farm against defendant National Farmers Organization, Inc., (NFO) seeking damages for an alleged breach of a milk marketing agreement and breach of fiduciary duty. The trial court granted a directed verdict on the fiduciary duty claim and the jury awarded $20,902.40 on the breach of contract claim. NFO appeals from the judgment against it and the dairyman cross-appeals from the entry of the directed verdict.

Reinhard Simon is the operator of a family partnership 300 cow dairy operation situated in Sedgwick County known as the Four Star Dairy. Simon has been in the dairy business since 1952 and has sold milk directly to manufacturers and processers and indirectly through marketing agreements. In February 1989, Simon entered into an exclusive marketing agreement with NFO which contained no references to price. Simon testified NFO's agent Norb Connor promised Simon would receive blend price plus 40 cents a hundredweight less certain marketing expenses. Simon terminated the agreement in July 1989 because he did not receive what he believed was the agreed-upon price for his milk.

In August 1989, Simon entered into a new marketing agreement with NFO which, again, did not contain an express guarantee of price. Simon testified he was orally promised, by Connor, that he would receive the blend price plus 20 cents a hundredweight less certain marketing expenses. The agreement was effective September 1, 1989.

Some discussion of blend price is appropriate. Although an oversimplification, the following explanation is adequate for the issues herein. Under federal regulation raw milk is classified into three quality categories, classes one, two, and three. Class one

milk is for bottled milk; class two milk is for cottage cheese and ice cream; and class three milk is for the manufacture of cheese. The United States is divided into geographical milk producing regions. The federal market administrator analyzes all milk sales in each region on a monthly basis and on the fifteenth of the following month publishes the uniform blend price for the particular area's month in question, which price is essentially an average of milk prices paid within the region and month involved. Raw milk is sold by the hundredweight (cwt), and this is the unit involved in the blend price. For example, the blend price for the region involved herein in September 1989 was $14.03 cwt.

Simon's testimony illustrates the difficult production and marketing problems facing America's dairymen. Simon's 300 cow herd requires approximately eight hours to milk and this is done twice a day. Simon has storage facilities for two days' production. He does not have the option of storing his product until the best price can be obtained. Every two days his milk has to be transported and sold. The highly perishable nature and liquid consistency of milk greatly restrict the geographical area in which milk can be profitably marketed.

Simon and four other producers market their milk together as their combined production fills the milk truck owned by one of the five, and the truck owner transports all the milk. Every two days' production leaves the respective dairyman's farm together and has to be delivered to a joint customer. If they are not operating under a marketing agreement, the little consortium of five must find its own market and deliver the milk thereto. If operating under a marketing agreement, the agent finds the market and advises the truck owner where to deliver the milk. But, in either case, the procedure is relentless and inexorable—every two days the milk has to be delivered and sold. Further complicating the situation is that within the geographical area where it is economically feasible to deliver the milk, there are relatively few buyers of large quantities of raw milk.

Two of the factors which prompted Simon to sign with NFO are that: (1) he would be paid more frequently than in direct sales; and (2) NFO had a trust fund which would enable him to be paid even if the purchaser failed to pay for the milk. This latter feature was particularly important as Simon had lost two

days' production after cancellation of the first NFO contract because the buyer had defaulted.

For the months of September 1989 through March 1990, Simon did not receive the blend price or 20 cent premium. However, what he actually received was within a dollar of the blend price. In April 1990 the price received was over two dollars short of the blend price, and the price received for the first part of May 1990 was roughly four dollars less than the blend price. Connor advised Simon NFO had lost its market, and he would terminate the agreement without the 30-day notification of termination set forth in the agreement if Simon desired. Simon did so terminate and began selling his milk directly to Bordens in Tulsa. For the remainder of 1990, Simon received prices in excess of the blend price.

On July 27, 1990, Simon filed the action herein seeking damages on two theories: (1) breach of contract for not paying the agreed blend price plus 20 cents cwt; and (2) breach of fiduciary duty to obtain the highest price for Simon's milk. By trial time, the parties had stipulated Simon's damages to be $20,902.40, so we do not concern ourselves with how damages were computed.

At the close of Simon's case, NFO moved for a directed verdict as to all claims. This was taken under advisement until the close of all the evidence. The trial court granted the motion as to the claim of breach of fiduciary duty only. The claim of breach of contract was submitted to the jury, which found in favor of Simon. NFO appeals from the jury award, and Simon cross-appeals from the entry of directed verdict.

## NFO'S APPEAL

For its first issue on appeal, NFO contends the trial court erred in admitting, over its objection, evidence of the alleged oral agreement to pay Simon a guaranteed price of the blend price plus 20 cents cwt. NFO argues the contract was complete and unambiguous; hence, introduction of additional oral terms violated the parol evidence rule.

When a contract is complete, unambiguous, and free from uncertainty, parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract

evidenced by the writing is inadmissible. *First National Bank of Hutchinson v. Kaiser*, 222 Kan. 274, 564 P.2d 493 (1977).

Whether an instrument is ambiguous is a matter of law to be decided by the court. As a general rule, if the language of a written instrument is clear and can be carried out as written, there is no room for rules of construction. *Godfrey v. Chandley*, 248 Kan. 975, Syl. ¶ 2, 811 P.2d 1248 (1991).

Regardless of the construction of a written contract made by the trial court, on appeal a contract may be construed and its legal effect determined by an appellate court. To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning. *Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co.*, 248 Kan. 657, Syl. §§ 1, 2, 810 P.2d 283 (1991).

With these rules in mind, let us review the contract in question, which provides in pertinent part:

"1. In accordance with my membership agreement with National Farmers Organization (hereinafter NFO) and pursuant to the terms and conditions hereof, I hereby authorize NFO to act for me as my exclusive agent to negotiate and enter into contracts for the sale of all milk or dairy products produced or controlled by me, wherever located, except milk consumed on my farm.

"2. I authorize NFO to require any purchaser of my milk or dairy products to pay the entire amount due for those products which NFO sells for me, and to assign such amount on my behalf, to the NFO Members Dairy Custodial Account, an Iowa Trust (hereinafter Trust) . . . . I also authorize the Trust to borrow money as necessary and to mortgage, pledge, assign and deliver any property of the Trust as security for these loans, including accounts receivable, contract rights and the proceeds of contracts which are created by NFO's sale of my milk or dairy products.

"3. I authorize the Trust, before remitting the net proceeds to me, to make repayment of loans, including interest, to reblend, if necessary, and to deduct one percent (1%) of the total proceeds of the sale of milk or dairy products sold by NFO for me as a check-off to NFO, my proportionate share of such necessary marketing and Trust expenses as the NFO National Board of Directors determines shall be paid by producers . . . . I further authorize (a) deduction of unpaid annual dues,

if any, in accordance with NFO policy and (b) payment and use of any interest income earned on the balance maintained by the Trust as determined by the NFO National Board of Directors.

. . . .

"7. No NFO representative is authorized to alter or add to the terms of this agreement except in writing approved by the Director of the NFO Dairy Department. NFO's waiver of breach of any one condition of this agreement with me or with any other producer does not constitute a waiver of a subsequent breach of that condition or of a breach of other conditions."

The NFO is a nonprofit cooperative. Marketing agreements from NFO are available only to its members. Becoming a member of NFO entails the payment of a $75 annual fee, which occurred herein.

In overruling NFO's motion in limine to exclude evidence of the alleged oral agreement relative to a guaranteed price, the trial court stated, in pertinent part:

"[W]e have been arguing whether or not this will vary, alter where this stands under allowing evidence in not in violation of the parol evidence rule or not allowing evidence in because of the parol evidence rule. . . .

. . . .

"[T]he court has come to the conclusion that what plaintiff is asking for, and what the defendant is trying to prohibit, is not something that would contradict, alter, or vary the terms of this particular agreement.

"But actually explains the agreement, and the understanding between the parties. . . .

"[T]here is a wide distinction between an attempt to contradict the terms of [a] written instrument and to explain the circumstances and conditions under which it was executed and delivered.

"It has regularly been held where [a] contract is incomplete or silent in any particular, parol evidence is admissible.

"So to show the actual agreement between the parties. This is not limited to cases where there is ambiguity. It is not that it's totally silent on this. But in the Souder case [Souder v. Tri-County Refrigeration Co., 190 Kan. 207, 373 P.2d 155 (1962)], there is a cite on page 212, where I think the Court [had a] very similar situation.

"Where it states on page 212, ruling of parol evidence to contradict, alter, or vary the terms of written instruments is not violated when such evidence does not contradict but explains or supplements in different or incomplete matters contained in the instruments.

"When it tends to show the relation of the parties and circumstances under which the instruments were executed.

"So I will overrule the motion in limine on part one and two. And allow the evidence to come in in the case over the objection of defense counsel, and his motion in limine."

We do not agree with the trial court's rationale. The contract, as written, is a straightforward marketing agreement designating NFO as the exclusive agent for the marketing of Simon's milk. The nature of the relationship being established is not ambiguous or incomplete. The alleged oral agreement making NFO a guarantor of a particular price would greatly alter that relationship and add a whole new dimension thereto. Clearly, the contract can be carried out as written. A price guarantee is not an essential omitted part of an agency agreement for the marketing of milk. Additionally, there is no ambiguity in the agreement requiring parol evidence to ascertain which of two or more meanings was intended.

We conclude that the trial court erred in holding that evidence of the alleged oral agreement was outside of and not barred by the parol evidence rule. Inasmuch as Simon's entire claim of breach of contract is based upon the alleged oral agreement, the judgment against NFO must be reversed.

NFO's other issue on appeal is that the trial court erred in denying its motion for a directed verdict on the breach of contract claim. The motion was premised on paragraph 7 of the contract, which provides in pertinent part:

"No NFO representative is authorized to alter or add to the terms of this agreement except in writing approved by the Director of the NFO Dairy Department."

NFO argues that this provision rendered any oral promise by Connor, the NFO representative, invalid and unenforceable. In view of the result reached on NFO's first issue, we need not determine this issue.

## SIMON'S CROSS-APPEAL

For the first issue of his cross-appeal, Simon contends the trial court erred in directing a verdict on his breach of fiduciary duty claim. Breach of contract and breach of fiduciary duty were presented as alternative theories of recovery for the same $20,902.40 stipulated damages.

The breach of fiduciary duty theory was, prior to trial, limited to whether or not NFO obtained the best price available for Simon's milk. During arguments at trial, this claim broadened out to include the position that a breach of fiduciary duty occurred, additionally, when NFO lost its primary market for the sale of Simon's milk in the spring of 1990 and did not inform Simon promptly so he could free himself of the marketing agreement and seek his own market. As will be recalled from the earlier statement of facts provided herein, Simon was let out of his contract in May 1990 without complying with the 30-day notice requirement because of the lost better market. After the better market was lost, the milk went to a cheese manufacturing plant which normally buys a lower grade of milk at substantially lower prices.

The trial court directed a verdict, pursuant to K.S.A. 1991 Supp. 60-250, on the breach of fiduciary duty claim on the basis that there was insufficient evidence thereon to submit it to a jury.

In *Turner v. Halliburton Co.*, 240 Kan. 1, Syl. ¶ 1, 722 P.2d 1106 (1986), we set forth the following rules relative to motions for directed verdicts:

"K.S.A. 60-250 allows a litigant to move for a directed verdict, and for judgment notwithstanding the verdict. In ruling on a motion for directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. This rule must also be applied when appellate review is sought on a motion for directed verdict. The same test is applicable to a motion for judgment notwithstanding the verdict."

Simon cites the following statement from *George v. Bolin-Williams, Realtors*, 2 Kan. App. 2d 385, 387, 580 P.2d 1357 (1978), in support of his position:

" 'It is well settled that "the relation existing between a principal and agent is a fiduciary one demanding conditions of trust and confidence." [Citations omitted.] "[I]n all transactions concerning and affecting the subject matter of his agency, it is the duty of the agent to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal. . . ." [Citation omitted.] The agent must give the principal the benefit of all his knowledge and skill and cannot withhold or conceal in-

formation from the principal.' " (Quoting *Sanders v. Park Towne, Ltd.*, 2 Kan. App. 2d 313, 317, 578 P.2d 1131, *rev. denied* 225 Kan. 845 [1978].)

We have no quarrel with this statement as to the duty of a fiduciary. The problem in this case lies with the sufficiency of the evidence that a fiduciary duty was breached. In his brief in support of his cross-appeal, Simon cites to us only one piece of evidence to support his claim—that he received $13.96 cwt after being released from the marketing agreement when he sold his milk directly as opposed to receiving $9.50 cwt on NFO's last sale of his milk. These are both May 1990 sales figures. Is this enough to present a submissible case to the jury on this claim? We believe not. Simon's own testimony was that after the NFO agreement was terminated, he sold his milk directly to Bordens in Tulsa for the $13.96 cwt figure. He also testified this market was not available to NFO as Bordens purchased milk exclusively from producers and through a cooperative in competition with NFO. Nowhere in the record is there evidence that NFO failed to seek the best available market for Simon's milk while it served as his agent. In fact, Simon in his own testimony does not even express such an opinion let alone state facts supporting such a conclusion.

Turning to the aspect of the claim relating to the contention that NFO should have notified Simon earlier as to the loss of the good market for the milk, no evidence was presented that the failure to so notify breached any industry standard or, in any way, fell below a milk market agent's duty of performance. The jury would have had no yardstick or guidelines with which to determine whether or not NFO breached its duty in this regard.

Applying the rules relative to a motion for directed verdict previously set forth herein, we find no error or abuse of discretion in the trial court's entry of a directed verdict on the breach of fiduciary duty claim.

Simon's final claim of error is that the trial court erred in denying his requested instruction on "ostensible or apparent authority and ratification." This issue involves the breach of contract claim and Norb Connor's authority to bind NFO notwithstanding paragraph 7 of the marketing agreement. We did not determine the legal effect of paragraph 7 as we reversed the judgment against

NFO on the basis of the parol evidence rule. Under the circumstances herein, we need not determine this issue.

The judgment against NFO on the breach of contract claim is reversed. The entry of the directed verdict on the breach of fiduciary duty claim is affirmed.

HERD, J., dissenting: I respectfully dissent from the majority opinion reversing the district court judgment. The majority invokes the parol evidence rule finding the marketing agreement between Reinhard Simon and NFO complete, unambiguous, and free from uncertainty and, thus, requiring the exclusion of extrinsic evidence of an oral agreement between Simon and NFO's agent, Norb Connor.

I have no quarrel with the parol evidence rule. It is essential to the resolution of disputes over written contracts. However, it is not an absolute. There are numerous valid exceptions. This case falls within some of those exceptions.

One exception is the doctrine of partial integration, which is invoked when a written instrument is shown to be an incomplete contract. Parol evidence is admissible to prove the entire contract. Such evidence is supplemental and not contradictory of the writing. Under this exception, the court must resolve, as a question of law, the preliminary question of completeness of the written contract. See 30 Am. Jur. 2d, Evidence § 1043.

The next relevant exception to the parol evidence rule is the collateral contract doctrine. Under this doctrine, a prior or contemporaneous collateral oral contract, not inconsistent with the written contract, may be proved by parol evidence. It must relate to the same general subject matter as the written contract and be supplemental thereto. It must have separate consideration from the written contract. 30 Am. Jur. 2d, Evidence §§ 1049-1050.

In many jurisdictions, parol evidence is admissible to show matters of inducement to enter the contract where the written contract would not have been executed but for the oral representations. 30 Am. Jur. 2d, Evidence § 1051.

Also, it is generally held that in the absence of a recital of consideration, which the parties intend to be contractual, parol evidence is admissible to show the consideration for the contract

if different from that expressed in the written instrument. 30 Am. Jur. 2d, Evidence § 1056; 3 Jones on Evidence § 16:37 (6th ed. 1972).

A careful examination of the Simon/NFO contract discloses nothing is stated in the written agreement about the purchase price or the quality of the milk to be sold. According to the written contract NFO can negotiate and sell for any price it chooses and base the price on any quality it chooses. Simon is in the dairy business to sell milk. The price he receives for his products for sale is the essence of his business; however, it is omitted from the written contract. It does not require NFO to sell for fair market price based on Grade A or blend price. The parol evidence of the inducement of 20 cents over the blend price offered by Connor to obtain Simon's signature and the recitation that Simon should receive the blend price does not contradict, alter, or vary the terms of the written agreement. It is merely supplemental to the contract. I believe omission of the price and quality of the milk qualify as a partial integration and as inducement to enter into the agreement. Because there was no separate consideration, the collateral contract doctrine does not apply.

The trial court relied upon *Souder v. Tri-County Refrigeration Co.*, 190 Kan. 207, 212, 373 P.2d 155 (1962), which states in pertinent part:

"There is a wide distinction between an attempt to contradict the terms of a written instrument and to explain the circumstances and conditions under which it was executed and delivered. It has regularly been held that where a contract is incomplete or silent in any particular, parol evidence is admissible to show the actual agreement between the parties, and this is not limited to cases where there is ambiguity. Parties to a contract know best what was meant by its terms and are the least liable to be mistaken as to its intention, and, where the contract is silent or ambiguous concerning a vital point incident thereto, parol evidence will be received to aid in its construction. [Citations omitted.]

"The rule against admission of parol evidence to contradict, alter or vary the terms of written instruments is not violated when such evidence does not contradict but explains or supplements indefinite or incomplete matters contained in the instruments, or when it tends to show the relation of the parties and the circumstances under which the instruments were executed. [Citations omitted.] In cases where a written contract does not definitely embrace the entire agreement of the parties, and thus their interests are not completely expressed, parol proof may be received to supplement and

explain that which is written. [Citation omitted.] Evidence of an omitted term has been received as to the time of payment of amounts due or to become due under a contract. [Citation omitted.] An oral agreement as to the manner in which a contract is to be performed is competent where the writing is not contradicted thereby, such as a delay in paying the purchase price."

The rule discussed in *Souder* has been incorporated into Article 2 of the U.C.C.:

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement *with respect to such terms as are included therein* may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement *but may be explained or supplemented*

"(a) by course of dealing or usage of trade (section 84-1-205) or by course of performance (section 84-2-208); and

"(b) *by evidence of consistent additional terms* unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." K.S.A. 84-2-202. (Emphasis added.)

I believe the trial court properly permitted introduction of Simon and Connor's oral agreement as to price and inducement.

I now turn to the issue of whether the district court erred in overruling NFO's motion for a directed verdict on the breach of contract claim arising from the provision in the written contract prohibiting an NFO representative from "altering or adding to the terms of the agreement" without written approval by the NFO Board.

As discussed earlier, the extrinsic evidence allowed does not alter or add to the terms and, therefore, this ban was not violated. The parol evidence provides missing elements in the contract. Hence, I believe the trial court properly overruled NFO's motion for a directed verdict.

I would follow our rule that a trial court judgment should be affirmed if possible and affirm the trial court herein.

LOCKETT, J., joins the foregoing dissenting opinion.