**Ronald CLAYTOR, Plaintiff,**

v.

**COMPUTER ASSOCIATES INTERNATIONAL, INC., Defendant.**

**No. 02–2194–JWL.**

United States District Court, D. Kansas.

March 14, 2003.

Order Denying Reconsideration May 7, 2003.

 

John R. Campbell, Jr., Loughlin, Johnson & Campbell, Kansas City, MO, Gerald L. Thompson, Kansas City, MO, for Plaintiff.

Tammy L. Horn, Brous Horn LLC, Overland Park, KS, Patricia A. Konopka, David E. Sampson, Stinson Morrison Hecker LLP, Kansas City, MO, for Defendant.

### MEMORANDUM & ORDER

LUNGSTRUM, District Judge.

Plaintiff filed suit against defendant, his former employer, alleging that defendant failed to pay him certain commissions allegedly owed to him. Plaintiff seeks to recover the unpaid commissions under breach of contract and conversion theories. In addition, plaintiff seeks statutory damages pursuant to K.S.A § 44–342 for defendant's failure to pay him earned commissions. Finally, plaintiff asserts a claim for wrongful discharge based on defendant's termination of plaintiff's employment in October 2001.

This case is presently before the court on defendant's motion for summary judgment (doc. # 48) on each of plaintiff's claims. As set forth in more detail below, the motion is granted with respect to plaintiff's breach of contract claim regarding the Century Business Systems transaction and with respect to plaintiff's claims for conversion, statutory damages and wrongful discharge. The motion is denied with respect to plaintiff's breach of contract claim regarding the DST transaction.[1]

### I. Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff worked for defendant as a sales representative from October 1, 1996 through October 31, 2001 when defendant terminated plaintiff's employment. Defendant is in the business of designing, developing and licensing computer software products and selling support services for those products. As a sales representative, plaintiff's compensation consisted, in part, of commissions paid on software license agreements. In this case, plaintiff claims that defendant failed to pay him commissions owed to him with respect to two separate license agreements that were executed by defendant in December 1999 and June 2001, respectively.

Defendant's sales representatives are either assigned to a specific product area in a specific geographic territory or assigned to a strategic accounts group ("SAG"). If the representative is assigned to one of defendant's three product areas (enterprise management; information management; and mainframe), then that representative typically services a number of

---

1. Plaintiff has filed a motion for leave to file a supplemental affidavit in support of his response to defendant's motion for summary judgment (doc. # 63). The motion primarily seeks to authenticate certain documents attached to plaintiff's response and to state expressly that plaintiff has personal knowledge of the facts contained in his affidavit. The court denies the motion as moot because nothing in plaintiff's proposed supplemental affidavit would alter the court's decision on defendant's motion for summary judgment.

defendant's clients within the representative's assigned territory. If the representative is assigned to an SAG account, then that representative typically services all three product areas for one specific client.

For each fiscal year, defendant maintained a Sales Compensation Plan that governed the payment of commissions to its sales representatives. Those Sales Compensation Plans incorporated by reference an individualized Wealth Enabling Plan ("WEP") for the sales representative based on the particular product area or SAG account to which the representative was assigned. The individualized WEP sets forth the representative's product group sales assignment (or SAG account assignment), base salary, annual quota and other information for that particular sales representative during the relevant time period. According to defendant, a sales representative may have only one WEP in effect at any time.

From April 1, 2000 through March 31, 2001 (*i.e.*, defendant's fiscal year 2001 or "FY 2001"), DST was one of defendant's clients and, more specifically, was one of defendant's SAG accounts. Throughout FY 2001, plaintiff was the SAG representative for DST and worked exclusively with that client. In February 2001, plaintiff worked on putting together a deal with DST that would have sold more than $30 million in products and services to DST over the course of 7 years. Defendant rejected the proposed sale, stating that it was not interested in pursuing sales resembling the one that plaintiff had structured. Thus, activity on this sale was suspended.

Beginning on April 1, 2001 (FY 2002), DST was no longer an SAG account, although plaintiff avers that defendant continued treating DST as an SAG account. Moreover, plaintiff's WEP executed at the beginning of FY 2002 assigned plaintiff to the SAG group and plaintiff continued to work on the DST account. Soon after the start of FY 2002, defendant reassigned plaintiff to the information management ("IM") product sales group and plaintiff received a new WEP for that group. However, plaintiff avers that he continued to work as a SAG representative for DST at defendant's express direction, despite the fact that he was formally assigned to the IM group. At some point thereafter, plaintiff requested that defendant reassign him from the IM group to the enterprise management ("EM") product sales group. Defendant did so and plaintiff received a new WEP for the EM group. According to plaintiff, he continued to service the DST account in all three product areas at defendant's specific request.

In mid-June 2001, defendant advised plaintiff that they were interested in pursuing the sale that plaintiff had structured in February 2001 and requested that plaintiff contact DST to reactivate negotiations. According to plaintiff, negotiations on the sale resumed due to his efforts and he was responsible, in large part, for closing the transaction in June 2001. Total commissions from the sale were $308,000; defendant paid plaintiff about $15,000 as a "discretionary" payment and contends that plaintiff was not entitled to any payment at all. Plaintiff contends that he was entitled to the full $308,000.

In December 1999, defendant entered into a license agreement with a company named Century Business Systems. That agreement did not close in plaintiff's geographic territory, but in the Ohio sales territory. Nonetheless, plaintiff was apparently instrumental in structuring the transaction and selling the deal to Century Business Systems. In recognition of plaintiff's efforts, one of defendant's senior vice presidents, Michael Saracini, requested via e-mail to another senior vice president, Mark Guido, that Mr. Guido consider giv-

ing plaintiff 50 percent of the total commissions on the transaction. Mr. Guido, via e-mail, agreed to the request and the e-mail exchange was then forwarded by Mr. Saracini to plaintiff, with the instruction to "wrap up" the transaction in October 1999, although the deal did not close until December 1999. For whatever reason, defendant did not give plaintiff 50 percent of the commissions on the Century Business Systems transaction; rather, defendant gave plaintiff roughly one-third of the total commissions on the transaction. Plaintiff alleges that he is entitled to additional commissions on this sale.

Additional facts will be provided as they pertain to plaintiff's particular claims.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir.2002). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.,* 259 F.3d 1226, 1231–32 (10th Cir.2001) (citing *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Spauld-*

*ing,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir.2001). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190, 1197–98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671). To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and in-expensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

In the pretrial order, plaintiff alleges that defendant breached plaintiff's Sales Compensation Plan for Fiscal Year 2002 ("FY 2002 Plan") by failing to pay him earned commissions relating to the DST transaction that closed in June 2001. He further alleges that defendant breached plaintiff's Sales Compensation Plan for Fiscal Year 2000 ("FY 2000 Plan") by failing to pay him earned commissions relating to the Century Business Systems transaction that closed in December 1999. Plaintiff also seeks to recover these unpaid commissions under the theory of conversion. In addition, plaintiff seeks statutory damages pursuant to K.S.A. § 44–342 for defendant's failure to pay him earned commissions. Finally, plaintiff asserts a claim for wrongful discharge. Defendant moves for summary judgment on all claims.

### A. Breach of Contract Regarding DST Transaction

■ Plaintiff's primary claim in this case is that defendant owes him nearly $300,000 in commissions from a license agreement executed between defendant and DST in June 2001. Total commissions from the DST transaction were $308,000. Defendant paid plaintiff about $15,000 in commissions, an amount that defendant contends was entirely discretionary as plaintiff was not entitled to any commissions at all. Plaintiff contends that he was entitled to receive $308,000 in commissions based on the express language of his FY 2002 Plan. In its motion for summary judgment, defendant contends that the plain language of plaintiff's FY 2002 Plan demonstrates, as a matter of law, that plaintiff is not entitled to any commission from the DST transaction. Defendant further contends that plaintiff cannot show that defendant breached any provision of the relevant Sales Compensation Plan or Wealth Enabling Plan when it failed to pay plaintiff a higher commission.

■ Defendant's first argument is that plaintiff's FY 2002 Plan unambiguously states that plaintiff is not entitled to receive a commission on the DST transaction. Specifically, defendant points to Section 8, paragraph A of the plan, which states as follows:

No Commission will be paid or earned on *sales made outside an Executive's* territory or *product group* unless this occurs in the course of territory change as defined in Section 2 and/or as defined in Section (7.B.8).

According to defendant, it had the discretion to pay plaintiff a commission for the transaction (discretion which it exercised) but it was not required to do so under the FY 2002 Plan because the DST transaction was outside of plaintiff's product group. According to defendant, the DST transaction was a mainframe product group transaction and plaintiff cannot show that he was assigned to the mainframe product group at any time during FY 2002. While plaintiff does not dispute that the DST transaction consisted primarily of mainframe components, he disputes whether he was, in fact, responsible for those mainframe components in June 2001. In that regard, plaintiff avers that in June 2001, defendant was still treating DST as a strategic account group ("SAG") and that defendant advised him to continue acting as the SAG representative on the DST account.[2] As the SAG representative for

---

**2.** Defendant contends that plaintiff's affidavit in this respect creates a sham issue of fact because plaintiff admitted in his deposition that DST was no longer an SAG account in June 2001. No sham issue is created by plaintiff's affidavit as plaintiff's statement that defendant continued to treat DST as a SAG account is in no way inconsistent with his admission that DST, in fact, was not a SAG account.

DST, plaintiff was responsible for all three product groups, including mainframe, information management and enterprise management. Defendant, then, is not entitled to summary judgment based on the language of Section 8, paragraph A of plaintiff's FY 2002 Plan.

Defendant next contends that plaintiff cannot show that defendant breached any particular provision of plaintiff's FY 2002 Plan when it failed to pay him additional commissions on the DST transaction. The court disagrees. As plaintiff highlights in his papers, the series of wealth enabling plans that plaintiff received in FY 2002 each include a schedule of commission rates to be paid to plaintiff based on quota achievement. The wealth enabling plans are incorporated by reference into the FY 2002 Plan. Thus, if defendant did not pay plaintiff a commission to which he was otherwise entitled, then a reasonable fact finder could conclude that defendant breached the terms of the relevant wealth enabling plan. While defendant contends that the wealth enabling plan in effect for plaintiff at the time of DST transaction closed in June 2001 did not cover the DST transaction, the plan also contains a provision that the plan may be changed by defendant at any time. Based on this provision, a reasonable fact finder could conclude that defendant expressly advised plaintiff to continue acting as the SAG representative on the DST account (regardless of what his particular wealth enabling plan contemplated) and to continue treating DST as an SAG account (regardless of whether, in fact, DST was an SAG account). If a fact finder construed these actions as a change in plaintiff's wealth enabling plan, then it would be reasonable to conclude that plaintiff should be compensated according to the terms of the plan in any event. For these reasons, plaintiff may be able to show at trial that defendant breached a term of his FY 2002 Plan when it failed to pay him additional commissions on the DST transaction.

## B. Breach of Contract Regarding Century Business Systems Transaction

Plaintiff claims that defendant owes him approximately $22,000 in commissions based on a license agreement that defendant entered into with Century Business Systems in December 1999. While plaintiff received $33,000 in commissions, he claims that he was entitled to additional commissions based on his FY 2000 Plan or, in the alternative, based on defendant's promise (in the form of an e-mail exchange between two of defendant's divisional senior vice presidents) to pay him additional commissions on the sale. Defendant denies that plaintiff was entitled to any commission under his FY 2000 Plan and further denies that the e-mail exchange constitutes an enforceable promise to pay plaintiff additional compensation. Defendant also contends that plaintiff has waived any right to seek additional commissions for the Century Business Systems transaction.

In its motion for summary judgment, defendant first asserts that the plain language of plaintiff's FY 2000 Plan dictates that plaintiff was not entitled to any commission on the Century Business Systems transaction because that transaction closed outside of plaintiff's territory. Specifically, defendant, like it did with respect to the DST transaction, relies on Section 8, paragraph A of plaintiff's FY 2000 Plan, which states as follows:

> No Commission will be paid or earned on *sales made outside an Executive's territory* or product group unless this occurs in the course of territory change as defined in Section 2 and/or as defined in Section (7.B.8) (emphasis added).

According to defendant, it had the discretion to pay plaintiff a commission for the

transaction (discretion which it exercised) but it was not required to do so under the FY 2000 Plan in light of Section 8, paragraph A. Defendant's argument, then, turns on the construction of Section 8, paragraph A of plaintiff's FY 2000 Plan.

Under Kansas law, the construction of a written contract is a matter of law for the court. *Wagnon v. Slawson Exploration Co.*, 255 Kan. 500, 511, 874 P.2d 659 (1994).[3] The "cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow." *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 23 Kan.App.2d 30, 36, 926 P.2d 669 (1996) (citing *Hollenbeck v. Household Bank*, 250 Kan. 747, 751, 829 P.2d 903 (1992)). Where a contract is complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence. *Simon v. National Farmers Org., Inc.*, 250 Kan. 676, 679–80, 829 P.2d 884 (1992).

As an element of contractual construction, whether an instrument is ambiguous is a question of law for the court. *Id.* A contract is ambiguous if it contains "provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Id.* Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." *Marquis v. State Farm Fire and Cas. Co.*, 265 Kan. 317, 324, 961 P.2d 1213 (1998). The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any perceived ambiguity, no ambiguity exists. *Arnold v. S.J.L. of Kansas Corp.*, 249 Kan. 746, 749, 822 P.2d 64 (1991).

Defendant urges that Section 8, paragraph A is unambiguous and clearly states that plaintiff is not entitled to a commission because the Century Business Systems sale closed outside plaintiff's territory. Indeed, it is undisputed that the Century Business Systems transaction closed outside of plaintiff's territory. Section 8, paragraph A of plaintiff's FY 2000 Plan, however, does not state that no commission will be paid if a deal "closes" outside the Executive's territory; rather, it states only that no commission will be paid on "sales made" outside the Executive's territory. Moreover, in his deposition, plaintiff explained that while the deal "closed" outside his territory (in the sense that the final papers were signed outside his territory), the deal was put together by plaintiff in plaintiff's territory. In other words, according to plaintiff, everything but the administrative "closing" of the deal took place in plaintiff's territory.

The court, then, is required to examine the meaning of the phrase "sales made" found in Section 8, paragraph A. When read in isolation, the phrase may appear to be ambiguous and could be interpreted as meaning either when the final papers on the transaction are signed (as defendant argues) or when the transaction was essentially put together (as plaintiff argues). When read in the context of plaintiff's FY 2000 Plan as a whole, however, any ambiguity is removed and it is clear that the parties intended the phrase "sales made" to mean when the transaction was actually completed and signed (or, when the transaction was closed, to use defendant's term). Throughout plaintiff's FY 2000 Plan, the court finds several clear indications that the significant event for pur-

---

**3.** The parties agree that Kansas law applies to all of plaintiff's claims.

poses of ascertaining the commissions owed to a representative is the actual closing of a given transaction. For example, in Section 3, paragraph B of plaintiff's FY 2000 Plan, regarding a prospective client's trial use of defendant's products, the Plan states "[i]f the prospect becomes a client, he must sign the standard CA License Agreement and Order Form in the formal way before recognition will be given as a completed sale." In Section 4, paragraph A of the Plan, defendant sets forth a list of documents that must be on file with defendant "in order for a license to be regarded as complete and recognized for commission earning or advance purposes." Those documents include a signed License Agreement and Order Form. These provisions, then, demonstrate that a commission is not earned until a sale is made-*i.e.,* the papers are signed and on file with defendant. Consistent with these provisions, Section 4, paragraph B mandates that a commission is not earned until defendant receives full payment from the client of all monies owed for the first 12 months of the license term. Moreover, in explaining the issuance of a representative's monthly commission statement, the Plan notes that the commission statement will reflect "all sales completed by 5 p.m. New York time." *See* Section 7, paragraph 5.

The court's conclusion that the phrase "sales made" is intended to reflect the completion of the sale finds further support in the plain meaning of the term "made." In that regard, Black's Law Dictionary defines "made" as "filed" or "executed." *See Black's Law Dictionary* 656 (6th ed.1991). The American Heritage Dictionary defines "made" as the past tense of "make." "Make," in turn, is defined as "to institute or establish; enact;" or "to cause to be or become." *See American Heritage Dictionary* 758 (2d College ed.1985). In sum, then, the court agrees with defendant that the language of Section 8, paragraph A, when read in the context of the Plan as a whole, is unambiguous. Because the Century Business Systems transaction closed outside of plaintiff's territory, the plain language of plaintiff's FY 2000 Plan dictates that plaintiff was not entitled to a commission for that transaction.

 Plaintiff's breach of contract claim regarding the Century Business Systems transaction is based not only on the express language of his FY 2000 Plan, but also on an e-mail exchange between two of defendant's divisional vice presidents (Mssrs. Guido and Saracini) in which they agree that plaintiff should receive a 50 percent commission for the Century Business Systems transaction. The e-mail exchange was then forwarded to plaintiff by Mr. Saracini. While the nature of his argument is not entirely clear, plaintiff seems to suggest that the agreement between Mssrs. Guido and Saracini constitutes an enforceable promise to plaintiff such that plaintiff could recover for a breach of that promise, regardless of whether he was otherwise entitled to a commission under the terms of his FY 2000 Plan. In its motion for summary judgment, defendant contends that the e-mail exchange between Mssrs. Guido and Saracini is simply not a contract with plaintiff.

The court agrees with defendant that plaintiff is not entitled to additional commissions based on the e-mail exchange between Mssrs. Saracini and Guido. In his e-mail request to Mr. Guido, Mr. Saracini writes as follows: "In consideration of [plaintiff's] efforts to date, I'd like to ask you for consideration in recognizing him with a 50/50 commission split." Clearly, then, Mr. Guido's promise to give plaintiff a 50/50 commission split was made after plaintiff had already performed-the promise was given in light of "plaintiff's efforts to date." In other words, Mr. Guido did not bargain for plaintiff's performance

when making the promise to pay because plaintiff had already performed at the time the promise was made. Plaintiff's past good efforts is no consideration for Mr. Guido's promise and the promise is, therefore, not enforceable. *See* E. Allan Farnsworth, *Contracts* § 2.7 at 52–53 (2d ed.1990). As Farnsworth notes in his treatise, if an employer promises an employee a gold watch "in return for your good work during the year just ended," but then reconsiders and does not give the employee the watch, the promise is unenforceable because past consideration is simply no consideration at all under the bargain theory. *See id.* Of course, as an alternative to the doctrine of consideration, plaintiff could have sought to enforce Mr. Guido's promise on the ground of reliance, or promissory estoppel. *See id.* § 2.19 at 92. Plaintiff, however, has not asserted this theory in the pretrial order and his papers do not suggest that he relied on Mr. Guido's promise in any way. In sum, then, plaintiff cannot enforce Mr. Guido's promise to give him a 50/50 commission split on the Century Business Systems transaction.

Because plaintiff has not shown that he was entitled to receive a commission for the Century Business Systems transaction under the terms of his FY 2000 Plan and has not shown the existence of an enforceable promise to pay him additional commissions, summary judgment in favor of defendant is warranted on plaintiff's claim that defendant breached a contract with plaintiff when it failed to pay him additional commissions on the Century Business Systems transaction.[4]

### C. *Conversion*

 Plaintiff also claims that defendant unlawfully converted plaintiff's earned sales commissions. Defendants moves for summary judgment on the grounds that plaintiff cannot, as a matter of law, maintain an action for conversion of compensation.[5] In support of its argument, defendant relies primarily on the Kansas Supreme Court's decision in *Temmen v. Kent–Brown Chevrolet Co.*, 227 Kan. 45, 605 P.2d 95 (1980). In *Temmen*, Kent–Brown withheld money from the paycheck of Mr. Temmen, an employee of Kent–Brown, without Mr. Temmen's written authorization. *Id.* at 50, 605 P.2d 95. After trial, the trial court permitted Mr. Temmen to amend his pleadings to state a claim for conversion. *Id.* at 49, 605 P.2d 95. The Kansas Supreme Court reversed and held that Kent–Brown's action did not constitute the tort of conversion. *Id.* at 50, 605 P.2d 95. Specifically, the court stated:

It has been uniformly held that conversion is an unauthorized assumption and exercise of the right of ownership

4. In its motion for summary judgment, defendant sets forth the alternative argument that, even assuming that plaintiff had a contractual right to a commission on the Century Business Systems transaction, he nonetheless waived any claim to additional compensation based on that transaction. The court declines to address this argument in light of its conclusion that summary judgment is appropriate in favor of defendant on other grounds.

5. Defendant sets forth two additional arguments in its motion for summary judgment. According to defendant, summary judgment is proper at least to the extent plaintiff's conversion claim is based on commissions arising out of the December 1999 Century Business Systems sale because the relevant statute of limitations would bar that claim. Defendant also asserts that plaintiff's conversion claim should be dismissed (or the claim for punitive damages should be dismissed) because it is entirely duplicative of the breach of contract claim (i.e., plaintiff has not shown an independent tort or separate injury). The court declines to address these arguments in light of its conclusion that Kansas law simply does not recognize a conversion claim based on a dispute over wages.

over goods or personal chattels belonging to another. We note also that:

> An action will not lie for conversion of a mere debt or chose in action. Hence, where there is no obligation to return identical money, but only a relationship of debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor.

*Id.* (citations omitted). Ultimately, the court concluded that the only permissible amendment to the pleadings would have been to allege breach of contract. *Id.* at 50–51, 605 P.2d 95.

Plaintiff asserts that the *Temmen* case is inapplicable because it refers only to the debtor-creditor relationship. The relationship in *Temmen,* however, was one of employer-employee, just like the relationship presented here. Moreover, five years after the *Temmen* decision, the Kansas Supreme Court summarized its holding in *Temmen* as follows:

> In *Temmen,* Kent–Brown Chevrolet deducted from the wages of its employee the cost of repairing the employee's car. In that case we held there was a mere dispute over wages, not over specific property, hence there could be no conversion.

*Carmichael v. Halstead Nursing Center, Ltd.,* 237 Kan. 495, 501, 701 P.2d 934 (1985) (holding that a negotiable instrument was specific property that could be the subject of conversion, unlike dispute over wages). The *Carmichael* decision, then, makes it clear that the Kansas Supreme Court in *Temmen* intended to exclude from the tort of conversion those situations in which an employee disputes the amount of wages owed to him. Plaintiff's allegations here amount to a dispute over the amount of wages paid to him, albeit in the form of commissions. He does not allege a dispute over specific property and he does not contend that defendant was obliged to return to him "identical money." In light of these undisputed facts, *Temmen* mandates the dismissal of plaintiff's claim for conversion.[6]

### D. Violation of K.S.A. § 44–342

Finally, plaintiff asserts a claim pursuant to K.S.A. § 44–342. This statute allows a plaintiff to collect statutory damages when a defendant "knowingly fails to pay a commission salesperson any earned commission" within 30 days after the salesperson's termination. Defendant asserts that it is entitled to summary judgment on this claim because plaintiff cannot show that defendant failed to pay him an "earned commission" as that phrase is defined in the relevant statutes. In that regard, an "earned commission" for purposes of K.S.A. § 44–342 means "commissions with respect to services or merchandise which actually has been delivered or furnished to, accepted by and paid for by the customer by the last day of the commission salespersons contractual relationship." K.S.A. § 44–341(b).

Defendant correctly points out that plaintiff has failed to come forward with any evidence concerning what amount of merchandise or services were actually de-

---

**6.** In support of his claim, plaintiff relies only on an unpublished Kansas Court of Appeals decision, *Miller v. Southwest Machinery & Tooling, Inc.,* 708 P.2d 1004, 1985 U.S. Dist. LEXIS 946 (Kan.Ct.App. Sept. 26, 1985). In *Miller,* the court held that the evidence was sufficient to establish the tort of conversion where the defendant, an officer of the plaintiff corporation, was under a "specific obligation" to invoice all sales and direct payment to plaintiff but, instead, altered the invoices and diverted corporate funds to himself. *Id.* at *2–*3. By contrast, defendant here never usurped funds from plaintiff; rather, defendant simply never gave to plaintiff what plaintiff maintained defendant owed him. Such a dispute over monies owed is the very situation that *Temmen* has excluded from the tort of conversion.

livered, furnished to, accepted or paid for by DST by the last day of plaintiff's contractual relationship. Indeed, plaintiff does not even address this argument in his papers. Thus, summary judgment in favor of defendant is appropriate on plaintiff's statutory claim. *See Allen v. Muskogee, Oklahoma,* 119 F.3d 837, 840 (10th Cir. 1997) (moving party need not affirmatively negate the nonmoving party's claim in order to obtain summary judgment; instead, "the movant only bears the initial burden of 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case").

 One last issue with respect to this claim, however, needs to be addressed. In his papers, plaintiff states that "if given more time for discovery, [plaintiff] could produce affidavits from DST providing additional evidence that the statute has been violated." Presumably, plaintiff's reference to additional discovery was intended to incorporate his motion for reconsideration (a motion that was pending at the time plaintiff filed his response to defendant's motion for summary judgment) of this court's order denying review of Magistrate Judge Waxse's order denying plaintiff's motion for a 45–day extension of the discovery period. Although the court denied plaintiff's motion for reconsideration and, thus, denied plaintiff's request for additional discovery, plaintiff could have obtained affidavits from agents of DST at any time prior to filing his response to defendant's motion for summary judgment and he did not need an extension of the discovery period to do so and the court so advised plaintiff at the hearing on plaintiff's motion for reconsideration.

Now, more than three weeks after the hearing, and after the court had commenced resolving defendant's motion for summary judgment, plaintiff has filed a motion pursuant to Federal Rule of Civil Procedure 56(f) and 32(a)(3)(E) for leave to obtain an affidavit from a DST representative or, alternatively, for an evidentiary hearing on defendant's motion for summary judgment (doc. # 64). The motion is denied. To reiterate, plaintiff could have attempted to obtain affidavits from DST representatives at any time prior to filing the response to defendant's motion for summary judgment and could have done so outside the formal discovery period. For whatever reason, he did not attempt to obtain these affidavits until after he filed his response to the motion for summary judgment and he has now discovered that the DST representative will not voluntarily submit an affidavit. The court declines to intervene at this late juncture. Plaintiff's initial petition filed in state court included a claim for statutory damages pursuant to K.S.A. § 44–342. Thus, plaintiff represented that he had facts to support that claim. It was his obligation to ascertain the elements of that claim and ensure that he could support that claim if challenged by defendants. It is simply inexcusable to wait after all the papers have been filed on a summary judgment motion to engage in efforts to obtain the requisite evidence to support a claim that was included in the initial petition. Moreover, the court concludes that an evidentiary hearing is not appropriate in this context. *See Geear v. Boulder Community Hosp.,* 844 F.2d 764, 766 (10th Cir.1988). For these reasons, plaintiff's Rule 56(f) motion is denied and defendant's motion for summary judgment is granted on this claim.

### E. *Wrongful Discharge*

 In the pretrial order, plaintiff claims that defendant unlawfully discharged him in violation of the covenant of good faith and fair dealing when it fired plaintiff for complaining about defendant's refusal to pay him his earned commissions. Defendant moves for summary judgment

on the grounds that plaintiff was undisputedly an at-will employee and Kansas does not recognize a claim for breach of the covenant of good faith and fair dealing in the employment-at-will context. Perhaps recognizing the merits of defendant's argument, *see Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 175, 872 P.2d 252 (1994); *Morriss v. Coleman Co.,* 241 Kan. 501, 518, 738 P.2d 841 (1987), plaintiff states in his response to the summary judgment motion that the nature of his wrongful discharge claim is that he was terminated based on his whistleblower status. Plaintiff, however, fails to assert in the pretrial order his contention that he was a whistleblower or that he was terminated based on his whistleblower status. Plaintiff, then, has waived this claim and summary judgment in favor of defendant is appropriate. *See Wilson v. Muckala,* 303 F.3d 1207, 1215 (10th Cir.2002) (claims, issues, defenses, or theories of damages not included in the pretrial order are waived).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. # 48) is **granted in part and denied in part**. Plaintiff's motion for leave to file a supplemental affidavit in support of his response to defendant's motion for summary judgment (doc. # 63) is **denied as moot**. Plaintiff's motion pursuant to Federal Rule of Civil Procedure 56(f) and 32(a)(3)(E) for leave to obtain an affidavit or, alternatively, for an evidentiary hearing on defendant's motion for summary judgment (doc. # 64) is **denied**.

**IT IS SO ORDERED.**

### *MEMORANDUM & ORDER*

Plaintiff filed suit against defendant, his former employer, alleging that defendant failed to pay him certain commissions allegedly owed to him. On March 14, 2003, the court issued a memorandum and order granting in part and denying in part defen-

dant's motion for summary judgment. Specifically, the court denied defendant's motion with respect to plaintiff's breach of contract claim regarding the transaction executed between defendant and DST, one of defendant's clients, and otherwise granted the motion. Defendant now moves the court to reconsider that portion of its order denying defendant's motion for summary judgment (doc. # 66). The motion is denied.

 Defendant's motion is made pursuant to Local Rule 7.3(b). That rule provides that a motion seeking reconsideration of a non-dispositive order "shall be based on (1) an intervening change in controlling law, (2) the availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice." D. Kan. R. 7.3(b). Reconsideration is also appropriate where a court "has obviously misapprehended a party's position on the facts or the law," *see Hammond v. City of Junction City,* 168 F.Supp.2d 1241, 1244 (D.Kan.2001), and this is the basis upon which defendant seeks reconsideration. Specifically, defendant contends that the court misapprehended defendant's argument in support of its summary judgment motion with respect to plaintiff's breach of contract claim concerning the DST transaction.

In its motion for summary judgment, defendant urged that because the DST transaction occurred in the mainframe product group and, thus, outside of plaintiff's assigned product group, the plain language of plaintiff's FY 2002 Plan mandated the conclusion that plaintiff was not entitled to any commission from that transaction. The court rejected this argument in light of evidence in the record suggesting that plaintiff, at defendant's express direction, was still responsible for all relevant aspects of the DST account (including mainframe components) despite the fact that his wealth enabling plan reflected for-

mal assignment to the EM product group. In drawing this conclusion, the court referenced a provision in plaintiff's wealth enabling plan that essentially permits defendant to change the plan (and, presumably, plaintiff's sales assignment) at any time.

■ Defendant now contends that, even assuming defendant expressly directed plaintiff to continue working on all aspects of the DST account, summary judgment must nonetheless be granted in defendant's ·favor because such express direction was not given in accordance with the plain language of plaintiff's FY2002 Plan and, thus, was insufficient to change plaintiff's territory or product group assignment. In support of its argument, defendant relies exclusively on section 2(B) of plaintiff's sales compensation plan, which states as follows:

*Territory Assignment*

At the beginning of the sales year, all Executives will be assigned a territory. [Defendant] reserves the right to alter the territory and/or to add or take away the right to sell specific products therein at any time during the sales year. No Executive has any proprietary right to or interest in any particular territory or transaction occurring therein. All changes to territory or sites require the prior approval of the [Regional Manager] and until such approval has been given, no commissions for sales in the new territory will be awarded or advanced or become earned or payable hereunder.

*See* FY2002 Plan, Section 2(B). Defendant, then, contends that the plain language of this section dictates that plaintiff's Regional Manager was required to approve any change in plaintiff's sales assignment; that plaintiff's Regional Manager did not approve any change in plaintiff's sales assignment; and, thus, any purported change in plaintiff's sales assignment

was ineffective for purposes of entitling plaintiff to any commissions for the DST transaction. Thus, defendant's motion to reconsider turns entirely on the construction of section 2(B).

As the court noted in its initial memorandum and order, the construction of a written contract is a matter of law for the court. *Wagnon v. Slawson Exploration Co.*, 255 Kan. 500, 511, 874 P.2d 659 (1994). The "cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow." *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 23 Kan.App.2d 30, 36, 926 P.2d 669 (1996) (citing *Hollenbeck v. Household Bank*, 250 Kan. 747, 751, 829 P.2d 903 (1992)). Where a contract is complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence. *Simon v. National Farmers Org., Inc.*, 250 Kan. 676, 679–80, 829 P.2d 884 (1992). As an element of contractual construction, whether an instrument is ambiguous is a question of law for the court. *Id.* A contract is ambiguous if it contains "provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Id.* Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." *Marquis v. State Farm Fire and Cas. Co.*, 265 Kan. 317, 324, 961 P.2d 1213 (1998). The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any perceived ambiguity, no ambiguity exists. *Arnold v. S.J.L. of Kansas Corp.*, 249 Kan. 746, 749, 822 P.2d 64 (1991).

The court does not agree with defendant that the language of Section 2(B) entitles it to summary judgment on plaintiff's breach of contract claim. At best, Section 2(B) raises an ambiguity in the contract such that parol evidence "is admissible to determine the intent of the parties to the contract." *Hart v. Sprint Communications Co., L.P.*, 872 F.Supp. 848, 854 (D.Kan. 1994) (citing *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 738 P.2d 866 (1987)). In that regard, it is not clear to the court that Section 2(B) addresses a change in territory assignment as opposed to a change concerning the territory itself (e.g., the boundaries of a specific territory; what products will be sold in that territory). In fact, the situation described by defendant in its motion to reconsider-changing a sales executive's territory assignment-actually seems to be addressed in Section 2(D). That paragraph states, in pertinent part, as follows:

*Territory and/or Account Changes*

From time to time, it may be necessary to change the territory of or account sites assigned to an Executive. A territory change will generally become effective on the first day of the month following the month during which notice of such change is given. Account sites are effective the date communicated to the Exec. [Defendant] reserves the right to make such changes at any time and from time to time in its discretion and [defendant] may adopt any rules relating to any such changes as [defendant] believes to be necessary or appropriate under the particular circumstances involved.

*See* FY 2002 Plan, Section 2(D).

Section 2(D), then, does not suggest that the approval of the Regional Manager is required before changing the territory assignment or account site assigned to a sales executive. To the extent, then, that Section 2(B) is intended to address a change to a sales executive's territory assignment, that provision seems inconsistent with Section 2(D). Thus, because Section 2(B) on its face does not clearly address the situation described by defendant, and because that issue appears to be addressed in Section 2(D), the court finds that the language of Section 2(B) is, at best, ambiguous. Moreover, as the ambiguity in the agreement presents a question of fact rather than a clear question of law, it is for the jury to resolve the issue. *See Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 15 Kan.App.2d 153, 157, 804 P.2d 1012 (1991) (if ambiguity in written instrument presents question of fact then question is for jury). The court, then, reiterates its conclusion that defendant is not entitled to summary judgment on plaintiff's breach of contract claim concerning the DST transaction.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for reconsideration (doc. # 66) of the court's order granting in part and denying in part defendant's motion for summary judgment is **denied.**

**IT IS SO ORDERED.**